```
         IN THE UNITED STATES BANKRUPTCY COURT
             WESTERN DISTRICT OF ARKANSAS
                  TEXARKANA DIVISION


IN RE: MEYER'S BAKERIES, INC.,      CASE NO. 4:05-bk-70837M
                                    CHAPTER 7
       DEBTOR


RICHARD L. COX, TRUSTEE                              PLAINTIFF

VS.                      AP NO. 4:07-ap-07205

PAN-GLO SERVICES                                     DEFENDANT
```

MEMORANDUM OPINION

On February 6, 2005, Meyer's Bakeries, Inc. (Debtor) filed a voluntary petition for relief under the provisions of Chapter 11 of the United States Bankruptcy Code. On March 23, 2006, the case was converted to Chapter 7, and Richard L. Cox (Trustee) was appointed Trustee.

On March 23, 2007, the Trustee filed this adversary proceeding against Pan-Glo Services (Pan-Glo) to recover five pre-petition transfers totaling $17,377.88 as preferential transfers pursuant to 11 U.S.C. § 547 (2005).[1] Pan-Glo filed a timely answer denying the Trustee's allegations in general and raising the affirmative defense of ordinary course of

---

[1] This section was amended by the provisions of BAPCPA, Public Law No. 109-9, Section 409, but the amendments apply to cases filed after October 17, 2005. This case was filed before October 17, 2005, therefore, the amendments do not apply.

business as provided in 11 U.S.C. § 547(c)(2)(A)(2005). Trial of the above-captioned matter was held in Texarkana, Arkansas, on February 1, 2008, after which the matter was taken under advisement.

The proceeding before the Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F). The following shall constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## THE FACTS

The facts are not in dispute. Pan-Glo is a subsidiary of Bundy Companies of Urbana, Ohio. (Tr. at 16-17.) Pan-Glo performs services for the commercial baking industry. (Tr. at 17.) After baking pans have been used about 2000 times they become dirty and the silicone glaze begins to wear off. (Tr. at 18.) The used baking pans are then delivered to Pan-Glo who cleans the pan and applies a silicone coating which extends its useful life. (Tr. at 18.) Pan-Glo provides services to larger commercial bakeries such as Sara Lee, Interstate, Southern Bakeries, and also to the Debtor. (Tr. at 18-19.) Pan-Glo is an affiliated company of American Pan Company which manufactures and sells the commercial baking pans. (Tr. at 19.) Pan-Glo is practically the sole provider

of the services it performs with the possible exception of one small company in Memphis, Tennessee. (Tr. at 19.)

Generally speaking, Pan-Glo's services are provided on credit to customers on a credit term printed on the invoice of "net ten days." (Tr. at 20.) However, the industry practice is that no payments are received within the ten days. (Tr. at 20.) The range of when payments are made to Pan-Glo are from anywhere under thirty days to several hundred days after the invoice is received. (Tr. at 20-21.) Collection efforts usually commence when an invoice becomes overdue by more than 120 days, but not always. (Tr. at 21.) Michael Miller, a witness for Pan-Glo, testified that it is his responsibility to oversee the accounts receivable for the company and that when an invoice becomes overdue by more than 120 days, he brings it to the attention of the president of the company who makes the ultimate decision about collection efforts. (Tr. at 17 & 38-39.) In general, when an invoice remains unpaid after 45 days, a letter, phone call, or maybe a reminder statement with "past due" stamped on it would be made or sent to the customer. (Tr. at 34.) The phone call would likely be after 60 days, with the calls going to the accounts payable department. (Tr. at 34.) Mr. Miller testified that "[w]e [Bundy Companies] try not to nag, being the dominant person,

we just – that tends not to be our owner's style." (Tr. at 38.)  The only calls that might contain a threat of litigation would be regarding an account from a new unknown business that is at least 120 days overdue, and those calls are very seldom made. (Tr. at 38.)

The relaxed credit policy is a business strategy of the company.  Mr. Miller testified that, "[w]e're friendly because we are pretty much, what you say, 'the king of the market.'  If we find ourselves really badgering customers, we're afraid we would start inviting competition in.  Russ Bundy, who is the owner of the company, he started from scratch and he had a lot of help on the way up, and so he takes very seriously helping customers grow themselves."  (Tr. at 39-40.)  Pan-Glo is a family owned business and is debt free. (Tr. at 40.)

Pan-Glo's experience with the Debtor was that payment was historically received well over ten days after the invoice date. (Ex. PG-1.)  Pan-Glo did not engage in any unusual collection activity on the Debtor's account either in past years or in connection with the invoices involved in this litigation. (Tr. at 21.)  Miller did remember making a few phone calls to the Debtor in 2003 and 2004, although he does not remember the specific details. (Tr. at 37.)

4

During the 90-day period prior to the filing of the petition, the Debtor made five payments to Pan-Glo. (Ex. PG-3.)  The first payment in the sum of $1,729.00 was credited by Pan-Glo on November 5, 2004, and cleared the Debtor's bank account on November 8, 2004, in payment of Invoice No. 02004903 dated August 13, 2004. (Ex. PG-1 and Pl.'s Ex. 1 & 2.)

The second payment of $6,110.00 was credited by Pan-Glo on November 29, 2004, and cleared the Debtor's bank account on March 30, 2004, in payment of Invoice No. 2004924 dated September 5, 2004.  (Ex. PG-1 and Pl.'s Ex. 1-A & 2-A.)

The third payment of $806.88 was credited by Pan-Glo on December 2, 2004, and cleared the Debtor's bank account on December 3, 2004 in payment of Invoice No. 02004930 dated September 11, 2004.  (Ex. PG-1 and Pl.'s Ex. 1-B & 2-B.)

The fourth payment of $5,274.50 was credited by Pan-Glo on October 7, 2004, and cleared the Debtor's bank account on December 27, 2004, in payment of Invoice No. 02004953 dated October 7, 2004. (Ex. PG-1 and Pl.'s Ex. 1-C & 2-C.)

The fifth payment of $3,457.50 was credited by Pan-Glo on January 19, 2005, and cleared the Debtor's bank account on January 20, 2005, in payment of Invoice No. 02004975 dated November 7, 2004. (Ex. PG-1 and Pl.'s Ex. 1-D & 2-D.)

## DISCUSSION

The Trustee established that all of the elements are present to constitute a preferential transfer as provided by of 11 U.S.C. § 547(b)(2005).  The only defense claimed by Pan-Glo is the affirmative defense of ordinary course of business.  This defense is found in 11 U.S.C. § 547(c)(2)(2005) as follows:

> (c) The trustee may not avoid under this section of transfer—
> (2)  to the extent such transfer was—
>    (A)  in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
>    (B)  made in the ordinary course of business or financial affairs of the debtor and the transferee; and
>    (C)  made according to ordinary business terms[.]

A defendant asserting the provisions of Section 547(c)(2) has the burden of proof to establish the applicability of this section by a preponderance.  <u>Official Plan Committee v. Expeditors International of Washington, Inc. (In re Gateway Pacific Corp.)</u>, 153 F.3d 915, 917 (8th Cir. 1998); <u>Jones v. United Savings and Loan Assoc. (In re U.S.A. Inns of Eureka Springs, Arkansas, Inc.</u>), 9 F.3d 680, 682 (8th Cir. 1993).

The Defendant in this case must prove that the payments to it were:

1.   payment of a debt incurred by the debtor in the ordinary course of business of the debtor and defendant;

2.   made in the ordinary course of business of the debtor and the defendant; and

3.   made according to ordinary business terms.

11 U.S.C. § 547(c)(2)(2005); In re Gateway Pacific Corp., 153 F.3d at 917; Bridge Information Systems, Inc. v. Merisel Americas, Inc. & MOCA (In re Bridge Information Systems, Inc.), 383 B.R. 139, 149 (Bankr. E.D. Mo. 2008).

The first element Pan-Glo must prove is that the debt was incurred in the ordinary course of business of the Debtor and Pan-Glo. The evidence is that the Debtor and Pan-Glo have had an established business relationship since late 1998. (Tr. at 22.) The evidence also establishes that the services provided to the Debtor were services utilized by commercial bakeries in general and performed by Pan-Glo in the ordinary course of it's business. (Tr. at 22.) The evidence leads to one conclusion which is that the debt was incurred in the ordinary course of business of both the Debtor and Pan-Glo.

The second element of Section 547(b)(2) requires proof that the transfers to Pan-Glo were made in the ordinary course of business or financial affairs of the Debtor and Pan-Glo. Factors to consider include the prior course of dealings

between the parties, the timing and amount of the payment, and whether payment resulted from pressure or any unusual activity by the creditor. 5 Collier's on Bankruptcy ¶ 547.04[2][a][B] at 547-60 (Alan N. Resnick & Henry J. Sommers et al. eds., 15th rev. 2007). A payment that is made beyond invoice or contract terms may still be considered in the ordinary course if late payments were the standard course of dealings between the parties. In re Gateway Pacific Corp., 153 F.3d at 917; Lovett v. St. Johnsbury Trucking, 931 F.2d 494, 497 (8th Cir. 1991).

    Pan-Glo introduced evidence that the Debtor made payments on average since December 13, 2002, of 70.2 days from the invoice date with payments ranging between 47 days and 102 days. (Ex. PG-1.) In the year preceding the preference period, the average date of payment by Pan-Glo was 72.7 days from the date of invoice. (Ex. PG-1.) The average date of payment by Pan-Glo in 2004 was 79 days from the date of invoice. (Ex. PG-4.) The average for the five payments made during the preference period was 80.2 days with a range of 73-85 days after the date of the invoice. (Ex. PG-3.) The alleged preference payments were all in the full amount of the referenced invoices. There is no evidence in the record that the alleged preferential payments were made as a result of any

creditor activity or pressure from the creditor.  See <u>Tolz v. Signal Capital Corp. (In re Mastercraft Graphics, Inc.)</u>, 157 B.R. 914, 922 (Bankr. S.D. Fla. 1993).  Pan-Glo has established that the Debtor's payments of trade invoices, even though consistently late according to the printed due date on the invoices, meets the ordinary course of business exception of Section 547(c)(2) because late payments were the established practice between the parties.  See <u>In re Tolova Pizza Products Corp.</u>, 3 F.3d 1029, 1032 (7th Cir. 1993). The range of late payments during the preference period does not differ enough from the range of late payments during the previous two years to fall outside the ordinary course of business.

　　　The third element of Section 547(c)(2) requires Pan-Glo to prove that the payments were made according to ordinary business terms.  This section requires an objective determination whether payments are ordinary in relation to the standard prevailing in the relevant industry.  <u>Peltz v. Merisel Americas, Inc. & MOCA (In re Bridge Information Systems, Inc.</u>), 460 F.3d 1041, 1044 (8th Cir. 2006); <u>In re USA Inns of Eureka Springs</u>, 9 F.3d at 684; 5 Collier's on Bankruptcy ¶ 547.04[2][a][c] (Alan N. Resnick & Henry J. Sommers et al. eds., 15th ed. rev. 2007).  See also, Phyllis

M. McKenzie, <u>Bankruptcy-Preferential Transfers-Ordinary Course of Business Exception Requires Objective Proof Of Industry Standards. Jones v. United Savings & Loan Ass'n.</u>, 17 U. Ark. Little Rock L. J. 817 (1995).

The evidence in the record is sufficient to establish that the alleged preferential payments were made according to industry standards and under ordinary business terms. Evidence was introduced regarding the turnover ratio for the forging and stamping industry, because as Mr. Miller testified, "[t]here is really nothing that we could put Pan-Glo into." (Tr. at 29.) The forging and stamping industry does not remotely resemble what Pan-Glo does and therefore is not "the industry." Pan-Glo dominates the industry of refurbishing commercial baking pans to such an extent that its business practices constitute the industry standard.

Mr. Miller testified that Pan-Glo did not like to badger customers about late payments because it was not the president of the company's style. (Tr. at 38-40.) He stated that the president of the company "takes very seriously helping customers grow themselves." (Tr. at 40.) The transactions with all domestic customers of Pan-Glo for the two years preceding the filing of the petition average 60 days with a range between 11 days and 314 days. (Ex. PG-4.) The average

for the Debtor over a two-year period was 70.2 days and the alleged preference payments averaged 80.2 days. (Ex. PG 1 & 2.) The payments made during the preference period fall well within the range of payments made by Pan-Glo's domestic customers within the past two years. Based on this evidence, the timing of the alleged preference payments are not practices between similarly situated parties so idiosyncratic to be considered outside the ordinary course of business. In re Tolova Pizza Products Corp., 3 F.3d at 1033; See also, In re U.S.A. Inns of Eureka Springs, 9 F.3d at 685.

Therefore, for these reasons, Pan-Glo has established the defense of ordinary course of business as provided in 11 U.S.C. § 547(c).

A separate judgment dismissing the Trustee's complaint will be entered pursuant to Federal Rule of Bankruptcy Procedure 9010.

IT IS SO ORDERED.

_____
HON. JAMES G. MIXON
U. S. BANKRUPTCY JUDGE

DATE: 05/08/08

cc: Richard L. Cox, Trustee
    Thomas S. Streetman, Esq.
    Stan D. Smith, Esq.